JACKSON, *ex dem.* GILLESPY AND OTHERS, v. WOOLSEY.

Where a party had given notice to produce a deed, which there was a strong presumption had either been destroyed, or was in the possession of the opposite party, he was allowed to give *parol* evidence of its contents.

The existence and execution of a deed from commissioners appointed under the statute to make partition, was, without any proof of loss, allowed to be proved by the testimony of one of the commissioners, and of the counsel who drew the deed.

In such case, it may be presumed, that the commissioners had executed a deed, pursuant to the order of the court.

Where one of the parties, applying to make a partition under the act of 1785. s. 15. is an adult, the proceedings are valid, tho' the others are infants.

A guardian *ad litem* in partition, may be a purchaser at a sale, made by the commissioners, pursuant to an order of the court.

THIS was an action of ejectment, tried at the *Orange* circuit, in 1813. The lessors of the plaintiff claimed, as heirs of *James Neely,* deceased, four fifths of a farm formerly belonging to him. The defendant claimed, under a deed, since lost or destroyed, from *James Neely,* to his daughter, *Jane Gillespy;* the operation of which deed was resisted, on the part of the plaintiff, by attempting to prove that it was delivered as an *escrow ;* by a sale under a judgment in partition between the heirs of *Jane Gillespy;* and a deed by the commissioners, who were appointed to make partition, to the purchaser, since lost or destroyed ; from whom, by sundry mesne conveyances, the defendant derived his title. The evidence, excepting such part of it as is detailed in the opinion of the court, was as follows :

It was proved, on the part of the plaintiff, that *James Neely* lived on the farm in question, until a few years before his death, which was in 1791, at the age of about 90 : that *William Gillespy,* who married *Jane,* a daughter of *Neely,* lived, at the same time, upon the farm, and worked it, and maintained *Neely* and his wife, which he acknowledged, to one witness, he was bound to do ; and after *Neely* and his wife left the farm, that *Gillespy* paid their board until their death ; and that it was understood that, after their death, the farm was to go to *Jane Gillespy.*

*Jonathan Fisk,* counsel for the plaintiff, stated, from notes which he had taken, the testimony of *Ann Hunter,* now deceased, (another daughter of *Neely's,*) given at a former trial of this cause, which corroborated the statement as above made by other witnesses.

On the part of the defendant, to prove, in the first place, the existence of the deed from *Neely* to his daughter *Jane ; James Hunter* testified, that in 1771 he was at *James Neely's* house, who produced a deed of lease and release, which he said he wished to execute. *Matthew Gillespy,* who was then married to *Jane,* and *William Gillespy,* his brother, were pre-

sent: that *William Gillespy* said, that he understood this was a sham deed; upon which *James Neely* observed, that it was as good a deed as *George Clinton* could write; and asked the witness to read the deed, which he did aloud; upon which *William Gillespy* was satisfied that it was a good deed; that the deed was then executed, in the usual manner, by *James Neely* and his wife, and that he and *W. Gillespy* witnessed it: that at the same time two bonds were executed, in like manner, by *Matthew Gillespy* and his wife to *James Neely;* one conditioned to pay the other branches of the family 100 pounds; the other, under a penalty of 60 pounds, to pay some debts of *James Neely;* which bonds he and *W. Gillespy* likewise witnessed: that the deed was to *Jane Gillespy* in fee; that a consideration was specified therein, and a receipt for the same endorsed: that the deed was for the farm in controversy, and that he understood that, in addition to the consideration therein contained, *Gillespy* and his wife were to maintain *Neely* and his wife during their lives: that after this was done, *Jane Neely* took the bonds and deed, by her father's request, and put them back into the chest from which *Neely* had taken them; and that the witness understood this arrangement to be complete and ended; and that nothing was said of the deed's being delivered as an *escrow:* that about five years after this transaction, the witness found this deed among his father's papers, who was then dead, and who was the husband of *Ann Hunter*, the witness' stepmother, and one of the daughters of *James Neely;* and that he kept the deed from that time until 1791, when *Matthew Gillespy* came to his house and requested it from him, to have it recorded, and he gave it to him, but the witness' stepmother was not present when the deed was delivered. *Jane Gillespy* died in 1788.

*Catharine Gillespy*, the widow (having been the second wife) and administratrix of the before-mentioned *Matthew Gillespy*, who died in 1797, testified that she had the custody of her husband's papers, and had never seen this deed among them; (but it appeared, on her cross-examination, that she could neither read nor write;) that *James Gillespy*, a son of one of the plaintiff's lessors, had access to these papers before she administered; that one *William Cummings*, at her request, assisted her in the administration of the estate; that she did not know that the

deed was ever found by him, and that he never took it away as she knew of.

The defendant produced the proceedings in partition in the *Ulster* common pleas, (under the act of the 16th of *March,* 1785,) the parties to which were *John Neely* and *Barbara* his wife, a daughter of *Jane Gillespy,* and *John, James, Matthew, Jane, Ann,* and *Mary Gillespy,* other children of *Jane Gillespy,* and lessors of the plaintiff, infants, by their father, *William Gillespy,* guardian, under which the land was sold to *Matthew Gillespy,* as the highest bidder, for 600*l.* The proceedings were set forth at length in the case.

In the next place, to prove the existence and loss of the deed from the commissioners to *Matthew Gillespy,* *Charles Clinton,* one of the commissioners, testified that the farm was sold to *Gillespy;* that he had not a positive recollection of executing a deed, but had not the least doubt that he and *Denniston,* another commissioner, since dead, gave the deed, and was certain that a deed must have been executed, though he had now no remembrance of the fact. *Gillespy* had made a contract to sell the farm to *Vankeuren* before the deed was executed; that *Gillespy* not being able to pay for the farm, the giving the deed was delayed for some time ; that he thought, but was not certain, that the deed was executed within a year after the sale, and before *M. Gillespy* conveyed to *Vankeuren,* who agreed to secure the money for the farm on the purchase to *Gillespy,* as guardian, and that no part of the money was ever received by the commissioners. On being afterwards examined a second time, the witness said that he now thought the commissioners' deed was executed soon after the sale, as soon as *Vankeuren* had secured the payment, until when the deed was kept back from *Gillespy.*

*James W. Wilkin* testified that he conducted the partition, as attorney ; that he wrote a deed, to be signed by the commissioners to *Gillespy,* and the draft of which he had; and that he was certain that he never should have drawn the deed from *Gillespy* to *Vankeuren* (which was shown to him, and which he acknowledged to be in his handwriting) with the recitals in it, if the commissioners had not previously conveyed to *Gillespy,* as he was employed by the parties to conduct the whole of the business.

The defendant, also, deduced a paper title to himself from *Matthew Gillespy.*

The plaintiff then proved that the defendant had notice of the claim of the plaintiff's lessors before he made the purchase.

The plaintiff next read the whole of the before-mentioned testimony of *Ann Hunter,* given at the former trial, as follows: That her husband had in his possession, the year after it was executed, the deed from *Neely* to *Jane,* and she understood that he had it to keep till the death of her father and mother, when it was to be delivered to *Gillespy,* who, in the mean time, was to occupy the farm, and maintain her father and mother out of the premises, of which, during his life, her father was to be the master; and that she had frequently understood this from all the parties; that when she heard that *James Hunter* had delivered the deed to *Gillespy,* she told him that he had done wrong, and that it was not to be delivered till after the death of her father and mother.

A verdict was taken for the plaintiff, subject to the opinion of the court on a case to be made, with liberty for either party to turn it into a special verdict.

*Fisk,* for the plaintiff. 1. The deed from *James Neely* to *Jane Neely,* who married *Matthew Gillespy,* was never so executed and delivered as to vest the estate in her or her heirs. It was not intended that *Matthew Gillespy* should ever have any control over the property. The deed was never delivered to him, but was retained by old Mr. *Neely* in his possession; it not being the intention that it should be delivered, during the life of him and his wife, whose support and maintenance was to be provided for.

2. If, however, the deed was executed and delivered, it was not produced; and its non-production was not sufficiently accounted for, at the trial, to entitle the defendant to give *parol* evidence of its contents. The grantor himself was produced as a witness, and this court, in *Willoughby* v. *Carleton,*[*] have decided that he cannot be a witness.

[* 9 Johns. Rep. 136.]

In *Read* v. *Brookman,*[†] the court decided only that a deed might be pleaded as lost by time and accident, without a *profert.* In *Livingston* v. *Rogers,*[‡] also, the non-production of the instrument was satisfactorily accounted for, before *parol* evidence

[† 3 Term Rep. 151.]

[‡ 2 Johns. Cases, 488.]

NEW YORK, was admitted as to its contents.  So, in *Jackson* v. *Neely*,* the
October, 1814. existence of the power of attorney, and its probable destruction
JACKSON     by fire, was shown before *parol* evidence was received.
v.
WOOLSEY.        3. The proceedings in partition were fraudulent and void;
*10 *Johns. Rep.* so that *Gillespy* acquired no title.  The court of common pleas
374.
cannot appoint a guardian, except for the purpose of partition.

4. The application for partition was made by infants who
are not authorized by the statute to make partition.  The act
was intended only to enable tenants in common to sell, and to
enjoy their estates in severalty.  The law does not presume that
infants can be under any necessity for selling their lands; and
a partition of them, during their infancy, cannot be requisite.

5. The sale by the commissioners was made without any con-
sideration received by them.  It was, therefore, void.  The
payment of the consideration money is essential to give va-
lidity to the conveyance.  A bargain and sale, without mo-
† *Willes' Rep.* ney being paid, is void.†  The statute requires that the sale
677. *Cro. Eliz.*
394.  3 *Term* should be at public auction, and contemplates a real sale for
*Rep.* 474.
money.  The directions of the statute must be strictly complied
with, otherwise the proceedings are void; the sale is inopera-
tive, and the party is not devested of his estate, and may enter.

6. The purchase by a guardian, trustee, or agent, is illegal
‡ 9  *Ves. jun.* and void.‡
234. 240.  10
*Ves.* 381. 394.

*J. Duer* and *Henry*, contra.  1. Whether the deed was de-
livered by the elder *Neely* to his daughter, absolutely or as an
*escrow*, was submitted to the jury; and this court, on a former
argument of this cause, on a motion for a new trial, considered
it as having been delivered absolutely, or if upon condition,
that such condition had been performed by the maintenance of
*Neely* and his wife.

2. We contend it was not necessary to produce the deed at
all.  The verdict was taken, subject to the opinion of the court
on the whole case, and the court is authorized to draw any in-
ferences which the jury might have done.  We do not pretend
that the proof is full and clear; but if a jury might have inferred
the existence and loss of the deed, that was all that was necessary
to entitle the party to go into *parol* evidence of its contents.

Again, as there was a conveyance, with *warranty*, the grantor
was entitled to the custody of the title deeds, and the law pre-

sumes that they were left in his possession.* It may, perhaps, be said this doctrine applies only to feoffments at common law; but the reason of the rule applies equally to conveyances under the statute of uses; for the grantor, or bargainor, who conveys with warranty, is bound to maintain and defend the title.

3. The proceedings in partition, in this case, were under the act of the 16th of *March*, 1785,† the provisions of which are different from the present act. The commissioners are empowered, where any part of the property held in common, cannot be divided without prejudice to the owners, to sell the same at public vendue, and execute good and sufficient conveyances to the purchasers.‡ There was, also, an order of the court of common pleas for that purpose; and the commissioners reported their proceedings, and that " they had, in all things respecting the same, followed the directions of the statute." This report was ordered by the court to be filed and confirmed, and that the commissioners should pass their deed to *Matthew Gillespy*, &c.

We were not bound to produce the deed, but its existence ought to be presumed, under the circumstances of the case. There is shown a concurrence of all those circumstances which are requisite to raise the presumption of the existence of a deed.§

4. The objections made to the proceedings in partition are for mere irregularities, and the court of C. P. having confirmed them, and given judgment of partition, it is conclusive. The 16th section of the partition act, of 1785, authorizes the court of C. P. to appoint, not merely a guardian *ad litem*, but a guardian with general powers, for all minors, of the age of fourteen years, who shall choose such guardians.

If the guardians, therefore, were duly chosen and appointed under the act, it is an answer to any objection as to the infants' applying for partition. But the statute authorizes any owners of lands to petition for partition; and, besides, *Barbara*, one of the children of *Jane Gillespy*, was an *adult* at the time of presenting the petition; and adults conjointly with infants may, most undoubtedly, petition; and a guardian, by the statute, may do every act relative to the partition, &c. which is declared to be as valid and binding on the infant, as if it had been done by him, after arriving at full age.

5. In regard to the sale by the commissioners, the court will

NEW YORK, October, 1814.

JACKSON
v.
WOOLSEY.
* 1 Co. 1, 2. Co. Litt. 6. a. 5 Co. 75. 3 Term Rep. 151.
† 8 Sess c. 39. See 1 Greenleaf's Ed. Laws, p. 165.

‡ Sect. 15.

§ 2 Caines' Rep. 372. 1 Caines' Cases, 70. 4 Term Rep. 682.

NEW YORK, October. 1814.

JACKSON
v.
WOOLSEY.

intend, after such a lapse of time, that the purchase was *bona fide.* It is enough that there was a regular sale under the statute, and by order of the court. The purchaser will not be affected by any misconduct of the commissioners. Again, no evidence can be admitted to contradict the fact, that the consideration money was paid, against the report under the hands and seals of the commissioners, which was confirmed by the court. Besides, the objection is merely formal; for it would have been an idle ceremony for *M. Gillespy,* as *guardian,* to receive with one hand money, paid by the other, as purchaser.

But it is said that a guardian cannot purchase at all. This rule does not apply to *judicial* sales. A *mortgagee* may purchase, under a sale made in pursuance of the power contained in the mortgage, or under the decree of the court. It may be greatly for the *interest* of the infant, that the guardian should have the power to purchase, in a case like the present.

*Burr,* in reply, said, that *M. Gillespy,* being a trustee, could not be a purchaser. Though it was once held that a trustee might purchase, where the sale was not at public auction, or before a master; yet it was now settled that the trustee could not be a purchaser, although at public auction, or before a master, under a decree of sale.* This is conclusive in the cause.

The burden of proof lies on the defendants, and they ought to make out a clear and satisfactory case.

As to the position that the grantor, having conveyed with warranty, is to be presumed to have the custody of the title deeds; though such may be the rule in *England,* yet it does not prevail in this state, where deeds are recorded, and the records are open to the inspection of all parties. The purchaser here takes the title deeds. In this case, the defendants allege that they had the possession of the deed, and that the lessors of the plaintiff stole them. Having once had them in their possession, they ought to give some satisfactory account of them.

The statute allows adults, who are tenants in common with infants, to coerce a partition, but infants are not authorized to become actors for the purpose of partition. They are altogether on the defensive; and their guardians are equally passive. But admitting that the statute authorizes infants to act, have the proceedings in this case been regular and legal? The law requires

*Sugden's Law of Vendors, 338. 395. 8 Bro. P. C. 42 3 Vesey. jun 678. 3 Vesey. jun. 337 10 Vesey, jun. 379,*

the guardian to give security; but it does not appear that such security has been given. The words of the condition of the bond taken, are merely that " if the guardian shall render a just and true account of his guardianship aforesaid, to the court aforesaid, when he shall thereunto be required, then," &c.

Again; no money was paid for the purchase; no deed was executed; for Mr. *Clinton* remembers only that a deed was drawn. This court ought to protect the rights of infants, in cases of partition, and these proceedings, if examined, will be found to be a fraud on the infants.

YATES, J. delivered the opinion of the court. The first question presented in this cause is, whether it was competent for the defendant to give parol evidence of the contents of the deed from *James Neely* to *Matthew Gillespy* and wife, and of the deed from *Charles Clinton* and *George Deniston*, commissioners appointed by the court of common pleas, of *Ulster* county, to make partition of the premises in question to *Matthew Gillespy*.

It is evident, from the testimony in this cause, that those deeds were never in the possession or control of the defendant. The premises in question were conveyed to him by *Matthew Gillespy*, who was answerable to him on failure of the title, and being liable over in value, as *warrantor*, he unquestionably retained them in his hands, which he had an undoubted right to do, as a protection against claims for the recovery of the property which might afterwards be attempted. If, however, by intendment of the law, they are not, in strictness, to be deemed in the possession of the opposite party, it appears that *Matthew Gillespy* is the father of one of the lessors, and his son had access to his papers, after his decease, and before the granting of administration to the widow. These additional facts furnish, at least, strong presumptive evidence, that those deeds are either destroyed, or in the possession of the opposite party. It is evident that they have never been in the possession of the defendant; so that their non-production at the trial cannot be attributed to *laches* on his part, especially as notice, with a view of having them produced, has been duly served on the opposite party, which was the only course the defendant could take to avail himself of the legal benefit now claimed by him.

A rigid adherence to the ancient rule of law on this subject has, by experience, been found, not unfrequently, to be attended with manifest injustice. A relaxation of this rule has, therefore, been introduced, depending in some measure upon the particular circumstances of the case; for it is, sometimes, impossible, when the destruction of an instrument has taken place, to obtain positive proof of the fact. To show the extent of this relaxation, the case of *Read* v. *Brookman* was cited. (3 *Term Rep.* 151.) It was there determined that a deed might be pleaded, as lost by time and accident, without *profert.* In *Beckford* v. *Jackson,* (1 *Esp. Rep.* 337.) the plaintiff declared on a deed, and, to avoid *profert,* stated that it was lost by time and accident. The defendant pleaded first, *non est factum,* and secondly, that the deed was not lost or mislaid; on both of which pleas issue was joined. On the trial, Lord *Kenyon* said, that to prove the issue, as to the loss of the deed, it was necessary to give evidence of a search where it probably might be found.

It appears, in the case before us, that an ineffectual search had been made for those deeds, among the papers of *Matthew Gillespy,* in the trunk where his papers were kept, the place in which it was most probable to find them. This, then, ought to be deemed sufficient proof of loss, or that they are in the possession of the opposite party. In either case, evidence of their contents would be admissible; and, on that subject, as to the deed of *James Neely* to *Matthew Gillespy* and wife, as well as the manner of executing it, one of the subscribing witnesses, *James Hunter,* is explicit. He says the deed was read aloud, at the request of old Mr. *Neely,* who declared it was as good a deed as *George Clinton,* the counsel employed to draw it, could write; that he executed it in the usual form, and that not one word was said respecting a conditional delivery. The circumstance of his daughter, *Jane,* returning the deeds and other papers, into the chest from whence they were taken, does not prove that the deed was delivered as an *escrow.* This chest was without a lock, and appears to have been in the use and occupation of the family, generally, and must have been accessible to every member of it. The deed was not delivered to a third person, nor were any conditions stated at the time. The executing of the bonds shows what was the consideration of the deed. He thought proper to cause *Matthew Gillespy* to execute them, to

secure the performance of the contract between them, which was the real consideration in the deed; and if those obligations did not secure a maintenance for him and his wife, it can only be attributed to his own folly or negligence. They were, however, maintained by him, as long as they lived. As far, therefore, as equitable considerations can influence the decision of the court, on this point, it appears to be just and right that the heirs of *Jane Gillespy* should enjoy the avails of this property. *Ann Hunter*, who had given her testimony on a former trial of this cause, (the evidence of which was now correctly admitted,) it appears, was not present at the time those papers were executed. Her evidence, therefore, as to her subsequent understanding and conversations, cannot destroy the explicit and direct testimony of a subscribing witness, who swears to the due execution of the deed, which passed the property in question to *Jane Neely*, and her heirs.

The next inquiry will be as to the proceedings in partition, to the regularity and validity of which several objections are raised, as well as to the competency of the proof, in relation to the execution and contents of the deed alleged to have been given by the commissioners appointed by the court. I shall examine them in their order.

The answer given to the objection that the application for partition was by infants, and not authorized by the statute, is, in my mind, conclusive. *Barbara*, one of the daughters of *Jane Gillespy*, and the wife of *John Neely*, (as appears by the proceedings,) was an *adult*, and she joined with her husband in the application for partition; and by the 15th section of the act of 1785, under which those proceedings were had, it may be done at the instance of one or more of the parties interested in the lands to be divided. This puts that objection at rest. The guardian having purchased the premises, does not affect the proceedings; nor can they, on that account, be deemed fraudulent. It was a public sale to the highest bidder, authorized by statute, and under the sanction and inspection of a court. Without circumstances of direct fraud, therefore, to support such an allegation, the deed is valid in law. But, in this case, no collusion appears; an adequate consideration has been received by the guardian for the use and benefit of the infants; and his not paying the money into the hands of the commissioners can be no objection. It appears they delayed giving the deed

to him, until the consideration was satisfactorily secured; and it is not improbable that *Vankeuren*, who purchased the property, would not have done it without receiving a conveyance direct from him, subjecting the title to his personal responsibility.

The doctrine laid down in *Sugden's Law of Vendors*, (388 to 395.) cited in the argument by the plaintiff's counsel, does not reach the present case. The sale here was not only public, and to the highest bidder, but made by the commissioners, according to the order of the court.

The circumstances of this case would warrant a jury to presume, that the deed alleged to have been given by the commissioners had been duly executed by them, in pursuance of the order of the court of common pleas; and if so, this court are bound to presume it. The objections stated in the argument, that the period of possession is insufficient to authorize such a presumption cannot prevent it. It is correct here to presume that they did their duty.

In the case of *England, ex dem. Syburn*, v. *Slade*, (4 *Term Rep*. 682.) the court determined, that in the case of a plain trust, where the trustees were directed to convey to a devisee on his attaining 21 years, the jury might be directed to presume a conveyance at any time afterwards, though considerably less than 20 years. Lord *Kenyon*, in giving his opinion, to which the other judges assented, says, " There is no reason why the jury should not have presumed a conveyance from the trustees to him, upon his attaining the age of 21, in pursuance of their trust." But without this presumption, I am inclined to think, from the reasons before stated, that the evidence of its execution and contents was properly admitted, and is sufficient to satisfy a jury of the facts. *Charles Clinton*, one of the commissioners, says, he thinks the deed was executed by them, soon after the sale, and before the last rule of court on the subject. His impression is, that it was kept back from *Gillespy* until the sale to *Vankeuren*, who (as the witness understood) had secured the consideration money to him, as guardian. He also recollects, that *James Wilkin* was to draw the deed; and *Wilkin*, who was also examined as a witness, declares, that the deed from *Matthew Gillespy* to *Benjamin Vankeuren*, for the premises, was in his handwriting. He was the counsel who conducted the proceedings in partition, and well remembers that

he wrote a deed, to be signed by the commissioners, to *Gillespy*, the draft of which was in his possession; and he was certain he never should have drawn the deed from *Gillespy* to *Vankeuren*, if the commissioners had not previously conveyed to *Gillespy*.

By the testimony of those two witnesses, then, the execution and contents of the conveyance were sufficiently substantiated. Admitting the objection, however, to the competency of this evidence, I think it has been satisfactorily shown, that the execution of the deed by the commissioners ought to be presumed.

On all the points, therefore, raised by the plaintiff's counsel, we are of opinion, that the cause is with the defendant, and that judgment ought to be entered accordingly.

Judgment for the defendant.