Ranney, J.
The questions presented in this case arise upon a special verdict, rendered in the court below, upon which a judgment was rendered for the defendants. From the facts found by the jury, taken in connection with several acts bf Congress, the following case substantially is made:
In the month of March, 1786, ton delegates, from several of the counties in the commonwealth of Massachusetts, assembled in the city of Boston, to consider of the expediency of forming a company or association to purchase lands and make a settlement in the western country. Their deliberations resulted in a determination to form such association, and on the third of that month, they entered into written articles for that purpose, by which it was stipulated that a fund not to exceed $1,000,000, exclusive of one year’s interest thereon, should be raised in continental specie certificates; that each share in the company should consist of $1,000, and upon each share $10, in gold and silver coin, should be paid to such agents as the subscribers might elect.
The whole fund of certificates was to be applied to the purchase of lands in some one of the proposed states, northwest of the river Ohio, or any other place adopted by Congress, not less advantageous to the company; the one year’s interest to the purpose *202 of making a settlement in the country, and assisting those who would be otherwise unable to remove there, and *the gold and silver, to the payment of the expenses of purchasing the lands, and other contingent charges.
To avoid expense and to render both agents and subscribers secure, the proprietors of twenty shares constituted a grand division of the company, and appointed their own agent, who became accountable to each subscriber for the certificates and money received, and that the subscriber should get a just dividend of the land purchased, both in quantity and quality, to be drawn by lot, and the agent was then bound to execute to the subscriber a deed of conveyance, similar to those he should receive from the directors. The agents being thus accountable to the subscribers, were to appoint the officers of the company, consisting of five directors, a treasurer and secretary, and they were to pay over into the hands of the treasurer all funds received by them.
The directors had the sole disposal of the company’s fund, and were required to purchase lands for the benefit of the company as before stated, either at public or private sale, as they deemed expedient. To secure the agents, both the treasurer and directors were required to give bond to them jointly and severally, for the faithful execution of their trusts; and the directors were still further bound, within three months from the completion of the purchase, to divide by lot, in such manner as the agents or a majority of them should agree, among the proprietors, the land so purchased, and thereupon to execute such deeds to the agents respectively, for the proportion that fell to the division of each, as the directors might receive from the commissioners of Congress.
No person was perm itted to hold more than five shares, and no subscription for less than a lull share could bo received. It was further provided, that if the whole fund should not be raised by October 17, 1786, the agent of any division might jjroeeed in the same manner as though the whole fund proposed had been raised.
Subscribers to this association were procured in all the New England States, New York, New Jersey, and extending south *as far as Virginia, to the number of eight hundred and twenty-two shares, for which payments were made in full.
In the fall of 1786, the agents of the company purchased of the United States, the district of country in the now State of Ohio, *203 known as the “ Ohio Company’s Purchase,” of which the premises in question are a part. On May 10, 1792, in obedience to an act of Congress, passed the 21st of April of the same year, the President of the United States, by two several patents of that date, granted the same lands, by particular descriptions, to Rufus Putnam, Manassah Cutler, Robert Oliver, and Griffin Green, the directors of said company, their heirs and assigns—964,285 acres— “ in trust for the persons composing the said Ohio Company’s associates, according to their several rights and interests, and for their heirs and assigns, as tenants in common.”
Jeremiah Williams was the owner of one share in the company. In the year 1793, and before any division of the lands was made, he died, intestate, leaving Eliza Williams, his only child and solo heir at law. After the death of Williams, on February 1, 1796, Rufus Putnam, Benj. Tallmadge, John Maury, and Benj. Ives Gilman, as agents of the proprietors, executed a deed of partition of the lands of the company, setting apart and allotting to each shareholder his land in severalty, by a precise and specific description, in which deed the land in question was set off and allotted to Jeremiah Williams as a part of his share.
In making this allotment, in no caso did the agents name the heirs of any deceased shareholder, but uniformly set it off, in the name of the original owner. This partition has been universally acquiesced in by the proprietors, and they and those claiming under them have possessed and enjoyed the property in severalty, without objection, and that whole district of country has been settled and grown up under it.
Eliza Williams, after the death of her father, married Samuel Bradlee, of Boston, Massachusetts. Neither she nor her father *ever took possession of this land, nor has she or her husband ever been in the State of Ohio. On June 26, 1846, they conveyed these lands to the lessor of the plaintiff.
Such is the plaintiff’s title. These further facts found by the jury are necessary, to understand the claim of title made by the defendants. On the death of Jeremiah Williams, Joseph Williams was appointed his administrator. On February 17, 1795, ho made application to the Supreme Judicial Court of the county of Suffolk, Massachusetts, for leave to sell, among other lands, one-half of this share, to pay the debts of the estate. Leave was given, and on August 13, 1795, he did sell and convey the whole share to *204 Thomas Lloyd, “attaching to said deed the original certificate showing the payment by said Jeremiah Williams of the moneys constituting him proprietor of said share.” In May, 1796, Lloyd assigned all his interest to Ebenczer Belknap, under whom the defendants claim one undivided half of the section described in the declaration. Possession was taken about nineteen years before the commencement of the suit, and has been continued to the present time.
The question arising upon this state of facts is, has the lessor of the plaintiff shown such a title as will enable him to recover in. an action of ejectment? Neither he nor those under whom he claims ever having had possession of this land, it was incumbent upon him to show a connected paper title from the government to sustain the action of ejectment. He did show a regular p>atent from the government to Rufus Putnam and others, in trust for the proprietors of the Ohio Company, of whom Jeremiah Williams was one. And ho claims from the other facts and circumstances established in the case, the court are authorized and bound to presume that a deed was made from tho trustees' to .the agents, and from the agents to the several proprietors, in accordance with their articles of association. And while it is claimed by his counsel that such a presumption would be in strict accordance with well-settled principles, its vast importance in this case is enforced from the consideration *that the land titles of a large district of country depend upon it, and it is supposed that not less than 300,000 acres of the lands of the company were allotted and set off in the name of former shareholders, who were dead at the time the partition was made.
The importance of the question is fully appreciated by us, and although we arc not aware that any diversity of practice has for a long time obtained in this court upon the subject, as no imported case is found, we have thought proper to consider, in the first place, and settle the main question raised, as applicable to these titles generally, without regard to such circumstances as are peculiar to this title.' The inquiry will then arise whether this case falls within the principle.
The first consideration that occurs to the mind, is that this whole business, from the beginning to the end, was to be performed by directors and agents, who, from the magnitude of the’ transaction, might almost be considered as holding a semi-official relation to *205 the proprietors. After the proprietor had paid his money and certificates, the whole obligation was thrown upon these directors and agents, to secure him a title to his proportion of the land purchased. The steps in order were for the directors first to purchase of, and take a title from the government. This they did. Their next duty was, within three months after the purchase, to divide the lands by lot among the proprietors, “ in such manner as the agents, or a majority of them,” might agree upon. This they did,, but not within the time stipulated. What is called the deed of partition can be regarded as nothing but such allotment. It is good, so far as we can see, for that and nothing else. It evidences the assent of the agents, in the manner provided for in the articles; and although it is suggested that the agents joining in the deed, did not represent a majority of the shares, the verdict does not show that to bo the fact, but the contrary. The obligation was to divide the land into as many parts as there were shares, and it was no part of their duty to subdivide it among heirs, to whom it might have descended. The fact, *thorefore, that a proprietor was dead, neither took from nor added to their duties, nor could it in any way affect the validity of their proceedings.
The next duty of the directors, after the partition, was to convey to the agents, and the duty of the agents immediately arose to convey to the proprietors. These deeds, if ever made, are not to be found. Can they, to protect the equitable rights, and perfect the titles of the proprietors, be presumed to have been executed? It will be seen that the question arises between trustee and cestui que trust, where the trustee had no right to retain the title, but was under a positive obligation to convey. In such cases we think the doctrine very clear, both upon reason and authority, that a conveyance may be presumed.
In Bowerman v. Lyburn, 7 Term, 3, Lord Kenyon said, “ that as to the presumption he had directed the jury to make, he had grounded himself upon the doctrine laid down by Lord Mansfield in Lade v. Holford, which was not, as had been supposed, that an ejectment might be maintained upon a mere equitable title, which would remove ancient landmarks in the law, and create great confusion; but that in all cases where trustees ought to convey to the beneficial owner, he would leave it to a jury to presume, where such a presumption might reasonably be made, that they had con *206 veyed accordingly, in order to prevent a title from being defeated by a matter of form. And he thought this rule, as far as it went, highly convenient and proper.”
No less explicit is the case of Hilary v. Waller, 12 Ves. 239. This was a bill brought for a specific performance. The defendant objected to the title, upon the ground that the legal estate was outstanding in the hands of a trustee. The master of the rolls presumed a release. He says : “ On what ground was such a presumption to be made? On this: That what ought to have been done should be presumed to have been done.” When the purpose is answered for which the legal estate was convoyed, it ought to be roconveyod. Presumptions do not always proceed on a belief that the thing ^presumed has actually taken place. “ Grants are frequently presumed,” as Lord Mansfield says, “merely for the purpose, and from a principle of quieting the possession. There is much occasion for presuming conveyances of legal estates, as otherwise titles must forever remain imperfect, and in many respects, unavailable, when, from length of time, it has become impossible to discover in whom the legal estate (if outstanding) is actually vested.” On appeal to the Lord Chancellor (Erskine), the decree was affirmed. He says : “ The presumption in courts of law from length of time, stands upon a clear principle, built upon reason, the nature and character of man, and the result of human experience. It resolves itself into this : that a man will naturally enjoy what belongs to him. That is the whole principle.” Mr. Justice Story, in delivering the opinion of the Supreme Court of the United States in the case of Prevost v. Gratz, 6 Wheat. 604, says: “The doctrine in Hilary v. Waller, on this subject, meets our approbation;” and it is also approved by Chancellor Kent, in Ham v. Schuyler, 4 Johns. Ch. 7; Dutch Church v. Mott, 8 Paige, 81.
Again, in Ricard v. Williams, 7 Wheat. 109, Mr. Justice Story says : “There is no difference in the doctrine, whether the grant relate to corporeal or incorporeal hereditaments. A grant of land may as well be presumed as a grant of a fishery, or of a common, or of a way. Presumptions of this nature are adopted from the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions;” “ and where the other circumstances are cogent and full, there is no absolute bar against the presump *207 tion of a grant within a period short of the statute of limitations.’’ If further illustration from the books were needed upon this subject, I know not where the general doctrine will be found more perspicuously stated than in 2 Cow. & Hill’s Notes to Phil. Ev. 368.
In speaking of presuming conveyances from trustees to cestuis que trust, these authors say, “And here courts do not *wait twenty years, or any given period, after the duty arises, but tho cestui que trust being in actual possession, and the duty of tho trustees thus partially executed, by allowing such possession, tho presumption is that they fulfilled the additional duty of making an actual conveyance, according to the trust. The cases on this head range from a very few years to fifty; but it is evident, from the principle on which tho decisions go, that a very short timo, in case of a clear trust, would readily be adopted. Tho rule prevails both at law and in equity. Law grounds its presumption on tho fact that a court of equity would compel the execution of such trusts, and seems, in this instance, very nearly to follow the rulo in chancery—that what ought to be'done shall be considered as done.”
From these authorities, as well as from the reason and justice of tho doctrine itself, we feel no hesitation in saying that wherever it may become necessary to protect the possession and equitable rights of those holding under the shareholders in this company, in accordance with the deed of partition or allotment, shown in this case, all such deeds of conveyance from the directors and agents as are necessary to clothe such equitable rights with perfect legal protection, may, and ought to be, presumed.
The next inquiry arising is, does the lessor of the plaintiff present us a case falling within this rule ? As we have already seen, the whole doctrine rests upon the idea that titles and possessions are to be quieted, not disturbed by it; that right and justice are protected in its application, not injured; in short, it is only “ what ought to be done,” that under this rule can be considered “as done.” It is only when clear and unquestionable equitable rights exist, that presumption can be called forth to clothe them with legal protection.
It is also conceded by the counsel for the plaintiff in error that actual possession in the party calling for this aid, or what is equivalent to it, must be found; but they insist that a state of facts, *208 equivalent to actual possession, in the heir of "Williams, is shown in this case. Let ns inquire what was her ^equity, and what are these facts thus relied upon., Jeremiah Williams was the clear and unquestionable owner, in equity, of one eight hundred and twenty-second part of the whole purchase. As evidence of this, ho hold from his agent a certificate showing tho fact. Ho was never, during his life, entitled to a conveyance of any specific land, for tho reason that such conveyance could not bo made until alter partition, which did not take place until three years after his death. It would be absurd, therefore, to presume that any deed was ever made to him. Upon, his death his equity descended to his heir; subject, however, to the payment of his debts. His personal representative applied for leave to sell it for that pui'pose; obtained it; sold it to Lloyd ; received the pay for it; made a deedr and with it transferred the original certificate given to Williams by the agent. And all this took place one year before the partition was made, and consequently before any specific land could be convoyed to the heir. Whether the heir was at this time an infant, or under coverture, does not appear. Nearly three generations of men passed away before we have any evidence that sho bestowed one thought upon this land, or did one act in respect to it; and, at the end of that time, all she did was to make a deed to tho lessor of the plaintiff. During all this time conveyances were-being made in tho chain of title under Loyd, and an actual possession for nearly twenty years had taken place. Wo are now asked, as against the actual occupants, to presume that a deed for this land was made from the directors or agents of the company to this woman, after the partition was made, upon the ground that the judicial proceedings under which this equity was sold wero invalid. It is undoubtedly true that those proceedings were inoperative to affect lands hold by either legal or equitable title-in Ohio. They could, so far as real estate is concerned, have no extra territorial íorce; and if the heir, from this circumstance, retained a legal advantage, wo would not take it from her. But sho has no legal advantage, but now seeks, by presumptions, to get it. To get it, sho must present *an honest, not a technical case. She can not, in honesty, take this land from the occupants, while her father’s estate was relieved with the very money that paid for it, and when she has acquiesced in tho action of the administrator for more than half a century. I know it is said *209 that she is a married woman; hut I have yet to learn that even married womon have a right to do wrong. We take from her none of her rights; we only prevent her from taking the rights of others.
I will now briefly advert to the authorities relied upon by the plaintiff’s counsel. The first is the case of Jackson v. McCall, 10 Johns. 380.
In this case the parties claiming the benefit of bne presumption, had been in actual possession for forty-one years, and this-circumstance is as strongly relied upon as in any case to be found in the books. The court say: “ This John McDonald died in possession, and the lessor of the plaintiff succeeded as his son and heir to the possession of the Provoost lot, and in which ho has since continued. We are then to conclude that the father purchased the Provoost title at an early day; and from the fact of the order of the council, and the original survey by government in 17C4, and the recognition of it in the patent to McKenzie in 17C5, and the continual and undisturbed possession by the family of the lessor, a patent to Provoost, and a deed from him to the elder McDonald, might even have been presumed, for the sako of quieting the possession. In the case of the Mayor of Hull v. Horner, Cowp. 102, Lord Mansfield held, that a grant or charter from the crown, which ought to be by matter of record, might, under the circumstances, be presumed, though within time of legal memory. The fact in such a case is presumed, for the purpose and from a principle of quieting the possession, and not because the court really think a grant has been made.” '
The cases of Clinton’s Lessee v. Campbell, 10 Johns. 475, and Jackson v. Moore, 13 Johns. 513, next cited, affirm the principle that where lands are conveyed by a number of persons to a trustee, to convoy according to a partition agreed upon *among the owners, deeds from the trustee in execution of the trust, would be presumed, after a lapse of many years, in favor of the persons equitably entitled thereto—the very doctrine held by us in the first part of this opinion.
The next caso cited is Jackson v. Woolsey, 11 Johns. 446. The defendant claimed under a deed from commissioners appointed to make partition, was in actual possession, and the equitable owner. Yates, J., in delivering the opinion of the court, says: “The circumstances of this case would warrant a jury to presume, that the deed alleged to have been given by the commissioners had *210 been duly executed by them, in pursuance of the order of the court of common pleas; and if so, this court are bound to presume it. The objection stated in the argument, that the period of possession is insufficient to authorize such a presumption, can not prevent it. It is correct here to presume that they did their duty.”
The case of Farrer et al. v. Merrill, 1 Greenl. 17, is claimed as a very strong one for the plaintiff. In that case it was decided that “ after a lapse of more than seventy years, without any adverse claim, the jury may presume a grant from the original proprietor of a share in a township of land, to a person afterward constantly acting as grantee of such share, sustaining various offices as such in the corporation of proprietors, and paying taxes thereon; although such share consist of wild land and be not holden by any open, visible possession.” C. J. Mellen, while he admitted the general rule, requiring actual possession on which to found the presumption, and that it could never arise where there was adverse possession, said he regarded these “circumstances as equal, perhaps, to open possession, in favor of the presumption.”
The points of resemblance between that case and tho one under consideration, are very few indeed. In that case seventy years had elapsed without any adverse claim—in this one fifty, with a constant adverse claim; in that, the person claiming the presumption had constantly acted as the grantee—in this, no *sueh acts are pretended; in that case the claimant had constantly paid the taxes—in this, none are paid ; in that case the lands were wild and unoccupied—in this, held adversely for many years.
Upon a careful examination of all the cases cited, we do not think they help the plaintiff’s case; and we are confident no case can be found where a deed has been presumed in favor of a party so thoroughly disconnected with the land as this plaintiff and those under whom he claims. Certain it is, that this court have most positively and explicitly held the contrary.
In Kinsman’s Lessee v. Loomis, 11 Ohio, 475, Judge Lane, in delivering the opinion of the court, says: “ But this presumption will not aid the plaintiff here. It springs from possession ; it is ■raised to support a possession; it has no existence in his favor who attacks the rights of one who holds the possession adversely against him.”
And again: In Harmon v. Kelly, 14 Ohio, 509, Judge Birchard, *211 delivering the opinion of the pourt, after quoting and approving this decision, says : “ When a cestui que trust has for a long time been in possession of lands which the trustee ought to have conveyed to him, the conveyance may be presumed, but the presumption is not raised in his favor who attacks or holds in opposition to the equitable right.”
This holding is in strict accordance with the well-settled rule of evidence upon the subject,- as found in the elementary books. It is thus stated in 2 Cowen & Hill’s Notes to 2 Phillips’ Ev. 356: “Sometimes a deed, in the execution of a trust, is to be presumed; sometimes a surrender of terms, or a conveyance in pursuance of some agreement, or in the execution of some legal duty ; or from some other circumstances. In all these cases adverse possession, or what is equivalent, makes the main ingredient ; but the time may overgo, or fall short of that required by the statute; and various auxiliary circumstances are admissible to support or detract from the presumption.”
The same rule is laid down by G-reenleaf, vol. 1, page 53. He says: “It is sufficient that the party who asks the aid of this ^presumption, has proved a title to the beneficial ownership, and a long possession, not inconsistent therewith ; and has made it not unreasonable to believe that the deed of conveyance, or other act essential to the title, was duly executed. Where these merits are wanting, the jury are not advised to make the presumption.” We are of opinion that all these merits are wanting in this case. In the first place, the lessor of the plaintiff has proved no “title to the beneficial ownership.” If he had a legal advantage by which he could recover the land, it would still be dishonest to do so, while the consideration paid for it was retained. He, or those under whom he claims, have had no “ long possession ” of this land, or indeed any possession, or anything equivalent to it. It would be difficult to imagine a ease of more entire absence of all acts or claims of ownership, than is found in this, for more than half a century. It is “ unreasonable to believe” that any deed was ever made by the agent to either Williams or his daughter. He was dead long before it could have been made, and his equity in the land was sold under the sanction of the highest judicial tribunal in the State of Massachusetts, where the parties all resided, and the original certificate transferred to the purchaser, also before any deed could have been *212 made to his heir. And while -these proceedings fail in legal efficiency to transfer the title, when taken in connection with the long acquiescence in them, they make it “ unreasonable” to suppose that the heir ever claimed, or the agent made her a deed, especially as his own liability was noL removed until his certificate was taken up or satisfied.
We are therefore unanimously of opinion, that no such conveyances as are claimed, could rightfully be presumed in favor of the lessor of the plaintiff, or in aid of the title under which he claims. This disposes of the case upon the broadest ground upon which the parties have placed it.
But a majority of this court are of opinion that a judgment could not, in any event, be rendered for the plaintiff, upon the special verdict found in the case. There are not facts enough *found by the jury to enable them to do so. Without the deeds sought to be presumed, it is conceded the plaintiff could not recover. The jury alone are authorized to presume them. This is not done; but a state of facts is found, from which it is claimed such presumirtions may bo raised. This is but the finding of evidence by the verdict, which is clearly insufficient. The rule is thus stated by Gould: “If, in a special verdict, the jury find only the evidence of a material fact, instead of the fact itself, or otherwise omit to find upon such a fact either way, no judgment can be rendered upon the finding for either party; since'a matter of fact, essential to a determination of the cause, is left unascertained by the verdict,” as if in trover the jury find the loss of the goods, the finding by defendant, and refusal to deliver them up on demand ; and he gives this reason : “ For the conversion, which is the gist of the action, is neither found nor denied by it; the demand and refusal being onlypnwia facie evidence of a conversion.” Gould’s Pleading, 525.
That these are more presumptions of fact, and to be drawn, by the jury, is well settled. In Ricard v. Williams, 7 Wheat. 109, it is said : “They may be encountered and rebutted by contrary presumptions, and can never fairly arise where all the circumstances are perfectly consistent with the non-existonco of a grant.”
In Jackson v. Porter, 1 Paine, 8, it was held by Thompson, J., that “ whether a deed is to be presumed from a long possession, is a mixed question of law and fact, and in most, if not in all cases, to be submitted to the jury under the advice of the court. The *213 existence of the deed is a fact for the jury, but its legal effect and operation is a question of law for the court.”
We see nothing erroneous in the judgment of the court of common pleas, and it must therefore be affirmed.